IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CT-03199-M

LORENZO TOVILLA,   )
                   )
        Plaintiff, )
                   )
v.                 )                    ORDER
                   )
CALVIN L. WOODARD, Jr., et al., )
                   )
        Defendants. )

This cause is before the court on plaintiff's "motion for summary judgment" [D.E. 23], plaintiff's motions to appoint counsel [D.E. 24, 35], defendant's motion for summary judgment [D.E. 28], and defendant's motion to seal [D.E. 33]. These motions are ripe for review.

Statement of the Case:

On June 15, 2020, Lorenzo Tovilla ("plaintiff"), a state inmate proceeding without prepayment of fees, [D.E. 4, 9], filed *pro se* a complaint under 42 U.S.C. § 1983 alleging that defendants were deliberately indifferent to his serious medical needs after his eye injury at Wilson County Jail (the "Jail") on September 13, 2018, see Compl. [D.E. 1]; Compl. Attach. [D.E. 1-1].

On November 12, 2020, the court conducted initial review, allowed the action to proceed against a defendant identified as Nurse Dawn, but dismissed other defendants. Order [D.E. 11].

Summons sent to the Jail were returned executed on November 23, 2020. [D.E. 13].

On January 5, 2021, because Nurse Dawn had failed to answer, the court issued notice directing plaintiff to proceed after failure to answer. See [D.E. 14] (citing Fed. R. Civ. P. 55). Also on that date, Nurse Dawn, properly identified as Dawn Vittorini, LPN, ("defendant"), filed a

motion to dismiss the complaint for improper service of process, Mot. [D.E. 17] (citing Fed. R. Civ. P. 12(b)(4), (5)), a memorandum in support [D.E. 18], and a declaration [D.E. 18-1].

On January 13, 2021, the court denied defendant's motion to dismiss and directed defendant to file an answer or other responsive pleading within fourteen days. Order [D.E. 20].

On January 21, 2021, defendant timely answered the complaint. Answer [D.E. 21].

On February 3, 2021, plaintiff filed a "motion for summary judgment,"[1] Mot. [D.E. 23], and a motion for appointment of counsel, Mot. [D.E. 24].

On February 23, 2021, plaintiff filed a response to defendant's answer, [D.E. 25].

On February 24, 2021, defendant filed responses in opposition to plaintiff's motion to appoint counsel, [D.E. 26], and to plaintiff's motion for summary judgment [D.E. 27].

On April 21, 2021, defendant filed a motion for summary judgment, Mot. [D.E. 28], together with a memorandum in support [D.E. 29], a statement of material facts [D.E. 30], an appendix [D.E. 31], a proposed sealed document [D.E. 32], and a motion to seal, Mot. [D.E. 33]. Also on that date, and pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the court notified plaintiff about the pending motion for summary judgment, the consequences of failing to respond, and the response deadline [D.E. 34].

---

[1] Although he styles this motion as a "motion for summary judgment," plaintiff actually asks the court to deny defendant's motion to dismiss and requests either summary judgment and/or default judgment pursuant to defendant's purported failure to answer the complaint. Mot. [D.E. 23]; see United States v. Winestock, 340 F.3d 200, 203 (4th Cir. 2003) (Courts "classify pro se pleadings from prisoners according to their contents, without regard to their captions."). To the extent plaintiff opposes defendant's motion to dismiss or seeks default judgment, this motion was moot at the time of filing because, on January 13, 2021, the court denied defendant's motion to dismiss and directed defendant to answer, see Order [D.E. 20], and, on January 21, 2021, defendant answered the complaint within the time provided, see Answer [D.E. 21]. Further, because plaintiff does not provide evidentiary support or present arguments as to the claims alleged in his complaint, this "motion for summary judgment" neither satisfies the filing requirements for a motion for summary judgment under Local Civil Rule 56.1, nor otherwise demonstrates that he is entitled to judgment as a matter of law pursuant to the standard of Federal Rule of Civil Procedure 56. See Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011). Accordingly, this motion [D.E. 23] is DENIED.

2

On May 11, 2021, plaintiff filed motion for appointment of counsel, Mot. [D.E. 35],[2] a response in opposition to defendant's motion for summary judgment [D.E. 36], a memorandum [D.E. 36-1], an opposing statement of material facts [D.E. 36-2], and an affidavit [D.E. 36-3].

On May 25, 2021, defendant filed a reply [D.E. 37], and, on June 1, 2021, defendant filed a response in opposition to plaintiff's motion to appoint counsel [D.E. 38].

Statement of the Facts:

As noted, the facts are somewhat disputed. At all relevant times, defendant was a licensed practical nurse employed by Southern Health Partners, Inc. ("SHP") to provide medical care to detainees at the Jail. Def.'s Stmt. Mat. Facts [D.E. 28] at ¶1. The Jail had 16 hours of medical coverage, seven days a week, and a registered nurse on call 24 hours per day, seven days a week. Id. at ¶2. Defendant then was Medical Services Coordinator at the Jail where she worked full-time, generally from 7 a.m. to 3:30 p.m., Monday through Friday. Id. at ¶3. Other nurses also then worked at the Jail; Nurse Winnie worked the Monday through Friday afternoon shift from 1 to 10 p.m., and Nurse Dot and Nurse Marlow worked Saturday and Sunday morning and afternoon shifts. Id. at ¶4. The medical director, Dr. Crocker, was available for phone consultations, and came to the Jail approximately one day per week to review patient charts and evaluate patients. Id. at ¶5. To be seen by medical personnel or request care, Jail inmates submit sick-call requests.

---

[2] No right to counsel exists in civil cases absent "exceptional circumstances." Whisenant v. Yuam, 739 F.2d 160, 163 (4th Cir. 1984), abrogated in part on other grounds by Mallard v. U.S. Dist. Court, 490 U.S. 296 (1989). "Exceptional circumstances" that contemplate appointment of counsel in *pro se* civil cases arise when a plaintiff lacks capacity to represent himself; this is a determination by the court that "hinges on [the] characteristics of the claim and the litigant." Whisenant, 739 F.2d at 163. Plaintiff asserts: he cannot afford or obtain counsel; the case is complex; he lacks law library access and has limited knowledge of the law; and English is his second language, causing a language barrier. Mot. [D.E. 24], Mot. [D.E. 35]. Because the case is not complex, and because plaintiff's filings show that he possesses the capacity to proceed *pro se* and in English, he fails to establish "exceptional circumstances" meriting appointment of counsel, cf. Whisenant, 739 F.2d at 163, and these motions [D.E. 24, 35] are DENIED.

3

Id. at ¶6. Except in emergency situations, inmates obtain treatment from nursing staff at the medical station. Id. at ¶7. Nursing staff do not make independent medical decisions; rather, Dr. Crocker makes orders for all treatment decisions, including prescriptions. Id. at ¶8. Plaintiff was an inmate at the Jail beginning on July 11, 2017, and at various times during the events of this action, where he received medical treatment from SHP nurses, including defendant. Id. at ¶9.

Plaintiff first sought medical treatment for his left eye at the Jail sometime between September 13 and 15, 2018.[3] Compare id. at ¶¶10–12, with Pl.'s Stmt. Mat. Facts [D.E. 36–2] at ¶¶3–5. Plaintiff received in-Jail eye treatment on September 16 and 17, 2018.[4] Def.'s Stmt. Mat. Facts [D.E. 28] at ¶¶14–16. On September 18, 2018, plaintiff was diagnosed with left eye

---

[3] Plaintiff's avers that: on Sept. 13, 2018, he was injured working at the Jail's kitchen when garbage disposal liquid went into his left eye, he notified defendant, then defendant and Corporal Cox used eye solution to rinse his eye; on Sept. 14, 2018, he informed defendant that his eye was not improved and the rinsing solution caused a burning sensation; on Sept. 15, 2018, plaintiff "was taken to see Nurse Dorothy who called the doctor, who then ordered eye drops that also caused burning and eye irritation, and drainage." Pl.'s Aff. [D.E. 36-3] at ¶¶3–6; see Compl. [D.E. 1] at 7 (alleging, on Sept. 14, 2018, after he complained his eye was not getting better, defendant told him that, due to Hurricane Florence, Jail medical staff could not do anything for plaintiff's eye). Hurricane Florence made landfall in North Carolina on Sept. 14, 2018, and Wilson, North Carolina, received 8.75" of rain from the storm. See https://www.weather.gov/mhx/Florence2018 (visited Nov. 6, 2020). Defendant, by contrast, avers: she does not recall seeing plaintiff for an eye issue on Sept. 13 or 14, 2018; she does not recall telling plaintiff Hurricane Florence prevented further treatment and she would not have said that; records show "medical staff was first notified of and/or treated" his eye issues on Sept. 15, 2018, when a nurse noted left eye redness; plaintiff did not then report, and the nurse did not observe, eye drainage; plaintiff informed the nurse it felt like there was sand in his left eye; the nurse entered Dr. Crocker's telephone orders as to treatment including Polytrim eye drops, as needed, and that, if the eye got worse, plaintiff should be sent to the emergency room. Def.'s App., Vittorini Aff. [D.E. 31-1] at ¶¶12–15. Contemporaneous medical records support defendant's version of the events. See [D.E. 32] at 4, 15 (Sept. 15, 2018, Dr. Crocker telephone order and medical note as to plaintiff's first complaint about his left eye, respectively).

[4] Defendant avers: on Sept. 16, 2018, plaintiff returned to medical; a nurse noted his left eye was very red and swollen, and there was a white ring around his iris; the nurse noted he would be sent to the emergency room for evaluation and treatment per Dr. Crocker's orders, but the doctor instead ordered that medical try eye drops before sending him to the emergency room; a Jail Captain went to the pharmacy and picked up eye drops which were started that day. Vittorini Aff. [D.E. 31-1] at ¶¶16–17. Defendant further avers that, at 4:30 p.m. on Sept. 17, 2018: plaintiff had a follow up at medical where he informed the nurse his left eye was still hurting and burning; the nurse took vital signs and noted no other signs of distress; the nurse spoke with Dr. Crocker who referred plaintiff to an outside ophthalmology provider; and the nurse entered a telephone order from Dr. Crocker for five days of ibuprofen. Id. at ¶18. Medical records support defendant's averments. See [D.E. 32] at 5, 16. Plaintiff avers that he "continued to complaint to [defendant] and nurse Winni [sic] that [the drops] were not working, and that they were burning [his] eye, that [he] was having drainage, and [his] vision was getting worse." Pl.'s Aff. [D.E. 36-3] at ¶7.

4

inflammation at Medical Eye Associates.[5]  Id. at ¶¶17–18.  On October 15, 2018, after a billing issue was resolved, plaintiff was scheduled for a follow up appointment at Medical Eye Associates.[6]  Id. at ¶22.  On October 16, 2018, plaintiff attended this appointment and lab tests were ordered.[7]  Id. at ¶23.  On October 17, 2018, a chest X-ray was performed at the Jail.[8]  Id. at ¶¶24–26; [D.E. 32] at 27 (Oct. 17, 2018, X-ray report finding no pulmonary tuberculosis or

---

[5] Defendant avers that: on Sept. 18, 2018, she called Medical Eye Associates and scheduled an appointment for 1 p.m. that day; at this appointment, plaintiff was diagnosed with left eye inflammation; when plaintiff returned to the Jail at 3:30 p.m., defendant entered new treatment orders from Dr. Crocker for Atropine eye drops (self-administered 3 times daily for a week or until the left eye issues were resolved) and Prednisone eye drops (self-administered 4 times daily, and then tapered weekly until the left eye issues resolved). Vittorini Aff. [D.E. 31-1] at ¶¶19–21. Plaintiff avers that: on Sept. 18, 2018, the eye doctor informed plaintiff that his eye was swollen and red and ordered more eye drops; he received the drops on Sept. 20, 2018; he used this medication for 7 days; "this medication also caused irritation and did not improve [his] eye problem." Pl.'s Aff. [D.E. 36-3] at ¶8. Medical Records show plaintiff was diagnosed with Uveitis, prescribed medications, and ordered to "follow up as needed." [D.E. 32] at 19.

[6] Defendant avers: on Oct. 12, 2018, she called Medical Eye Associates to schedule a follow up appointment because plaintiff "had complaints of not being able to see correctly"; Medical Eye Associates informed defendant they would not make a new appointment until the September appointment bill was paid; defendant notified the SHP corporate office of the billing issue on that date; on October 15, 2018, she was able to schedule a Medical Eye Associates appointment for Oct. 16, 2018. Vittorini Aff. [D.E. 31-1] at ¶¶22–24. Plaintiff avers: on Oct. 12, 2018, "after repeated requests to see the doctor, I was able to receive a visit from my attorney and explained to him what was going on with my eye, and the issues I was having with not getting serious medical attention about my left eye"; also on Oct. 12, 2018, "I submitted a grievance detailing what was going on and the issue with my left eye and the inadequate treatment I was receiving from the medical staff, including [defendant]"; on Oct. 15, 2018, "Captain Conner came to . . . speak with me about the grievance . . . and I explained to him how my left eye was getting worse, and how the eye drops and treatment I was getting was not working"; circa Oct. 15, 2018, plaintiff was informed that defendant was unable to schedule the follow up appointment with Medical Eye Associates because of a billing issue; on Oct. 16, 2018, plaintiff learned that defendant had scheduled the appointment. Pl.'s Aff. [D.E. 36-3] at ¶¶10–14.

[7] Plaintiff avers that: a historical January 2017 screening by an eye doctor found plaintiff had 20/20 eyesight; on Oct. 16, 2018, he attended the appointment at Medical Eye Associates; plaintiff was referred to Dr. Genge who checked plaintiff's eyes, noted that his left eye had become worse, and referred plaintiff to Dr. Tegins; and Dr. Tegins "told [plaintiff] that if [he] could have seen her weeks earlier, [he] could have avoided a lot of problems with [his] eye, including the damage already done, and the loss of vision problems." Pl.'s Aff. [D.E. 36-3] at ¶¶16–18. Medical records reflect that plaintiff saw a retinal specialist (presumably Dr. Tegins) who diagnosed left eye Anterior Uveitis, and that Doctors Tegins and Genge entered prescriptions, ordered labs, and requested a follow-up appointment in one week. [D.E. 32] at 21, 24–25. Defendant avers that, after plaintiff returned from his Oct. 16, 2018, Medical Eye Associates appointment, a nurse saw plaintiff at 7:15 p.m., took vital signs, and entered plaintiff's new treatment orders. Vittorini Aff. [D.E. 31-1] at ¶25.

[8] Defendant avers that, on Oct. 17, 2018: she noted new orders in plaintiff's chart including specialty labs, outpatient labs, and an X-ray; and Dr. Crocker entered new medication orders for Bactrim (twice daily for 30 days), Atropine eye drops (self-administered twice daily until the left eye issues were resolved), and Durezol eye drops (self-administered four times daily until the left eye issues had resolved). Vittorini Aff. [D.E. 31-1] at ¶¶26–27.

5

acute pulmonary disease). On October 18, 2018, Jail medical staff sent the X-ray report to Medical Eye Associates. Def.'s Stmt. Mat. Facts [D.E. 28] at ¶¶27–28. On October 23, 2018, lab results arrived, plaintiff attended a follow-up appointment at Medical Eye Associates, but no new orders were entered. Id. at ¶¶29–30; [D.E. 32] at 28–34 (lab results). On October 24, 2018, plaintiff was transferred to Central Prison.[9] Def.'s Stmt. Mat. Facts [D.E. 28] at ¶¶31–32. A Central Prison ophthalmologist diagnosed plaintiff with posterior uveitis. Id. at ¶33. On November 6, 2018, plaintiff was referred for treatment at Duke Eye Center, and he received follow-up appointments on December 4, 2018, and January 3, 2019.[10] Id. at ¶¶34–35. On January 19, 2019, plaintiff returned to the Jail.[11] Id. at ¶36. On February 6, 2019, defendant scheduled plaintiff for another follow up appointment at Duke Eye Center that plaintiff attended on February 7, 2019.[12] Id. at ¶¶ 37–38. On February 8, 2019, Dr. Crocker entered a medication order.[13] Id.

---

[9] Plaintiff avers that his attorney filed a motion on October 21, 2018, to transfer plaintiff to the Regional Medical Center at Central Prison so that plaintiff would have access to better medical care. Pl.'s Aff. [D.E. 36-3] at ¶19.

[10] Plaintiff avers that he was referred to a specialist at Duke Medical Center for further treatment on Dec. 4, 2018, that he continues to see specialists at Duke for ongoing treatment, and that, circa Dec. 2018, Duke specialist Dr. Grewal "declared that the issue with [his] eye is chronic and that his treatment would be ongoing." Pl.'s Aff. [D.E. 36-3] at ¶¶21–22. Defendant avers: on Nov. 6, 2018, the Duke eye care specialist diagnosed plaintiff with posterior uveitis and chorioretinitis suspicious for toxoplasmosis; on Dec. 4, 2018, the Duke eye care specialist confirmed plaintiff's chorioretinitis was consistent with toxoplasmosis, found minimal improvement in his eye despite medication, but found his vison was stable; on Jan. 3, 2019, plaintiff received another follow-up with an eye care specialist at Duke Eye Center. Vittorini Aff. [D.E. 31-1] at ¶¶35–37. Available medical records include a Dec. 4, 2018, treatment record with Dr. Grewal at Duke. See [D.E. 32] at 35–41 (Dec. 4, 2018, treatment record).

[11] Defendant avers that, upon his return to the Jail, plaintiff was "accompanied by his current medications." Vittorini Aff. [D.E. 31-1] at ¶38. Defendant further avers that Dr. Crocker entered the following medication orders in plaintiff's chart: low dose aspirin once daily for 90 days; Simvastatin once daily for 90 days; Bactrim twice daily until further notice; Prednisone once daily for 90 days; and Feldene once daily for 2 days. Id.

[12] Defendant avers that: on Feb. 7, 2019, the Duke eye care specialist noted plaintiff's eye had improved and he had a chorioretinal scar consistent with ocular toxoplasmosis. Vittorini Aff. [D.E. 31-1] at ¶40. Medical records support defendant's averment. See [D.E. 32] at 44–49 (Feb. 7, 2019, Duke treatment record with Dr. Grewal assessing toxoplasma panuveitis with a more consolidated lesion compared to prior exam).

[13] Defendant avers that Dr. Crocker's Feb. 8, 2019, medication order was for Bactrim twice daily for 90 days and Prednisone once daily for 30 days. Vittorini Aff. [D.E. 31-1] at ¶41.

at ¶39. On April 18, 2019, defendant scheduled plaintiff a follow up appointment at Duke Eye Center on May 2, 2019. Id. at ¶40. On April 19, 2019, Dr. Crocker renewed medication orders for Simvastatin and low-dose aspirin for 90 days. Id. at ¶41. On May 2, 2019, plaintiff attended a Duke Eye Center appointment,[14] and Dr. Crocker entered a 90-day order for Bactrim. Id. at ¶¶42–43. On May 24, 2019, defendant called to ask about an eyeglasses prescription and was told Duke Eye Center previously informed plaintiff to follow up with the Jail doctor if in need of eyeglasses. Id. at ¶¶44–45. On July 17, 2019, Dr. Crocker renewed plaintiff's medication order for Simvastatin was renewed for 90 days but did not renew the order for low-dose aspirin. Id. at ¶46. On July 31, 2019, Dr. Crocker renewed plaintiff's Bactrim order for 90 days. Id. at ¶47.

The parties disagree when plaintiff initially sought left eye treatment,[15] and if defendant delayed his medical care,[16] discontinued his medication,[17] or was deliberately indifferent.[18]

---

[14] Defendant avers, on May 2, 2019, the Duke specialist found the scarring and lesions in plaintiff's eye, suggested that his ocular toxoplasmosis was chronic, but requested no further follow up. Vittorini Aff. [D.E. 31-1] at ¶44. Medical records support this averment. See [D.E. 32] at 50–56 (May 2, 2019, treatment record assessing toxoplasma panuveitis, decreased left eye visual acuity, and changes to chorioretinal lesion suggesting chronicity).

[15] Compare Pl.'s Aff. [D.E. 36-3] at ¶¶3–6 (alleging his initial eye injury and treatment was on Sept. 13, 2018), with Vittorini Aff. [D.E. 31-1] at ¶¶12–15 (noting medical's first record of plaintiff's left eye complaint on Sept. 15, 2018).

[16] Defendant avers there is no record of delay in attending to plaintiff's medical needs or any delay in medical treatment for plaintiff's eye issues. Vittorini Aff. [D.E. 31-1] at ¶48. Plaintiff, by contrast, avers that: from Sept. 20 to Sept. 27, 2018, "I repeatedly told [defendant] that the eye drops medications were not working, and that I needed to go back to the doctor for additional treatment. I also told [defendant] that I continued to have burning in my eye." Pl.'s Aff. [D.E. 36-3] at ¶9; see also Pl.'s Stmt. Mat. Facts [D.E. 36-2] at ¶6 (noting that, after using eye drops for 7 days, the medication caused severe eye irritation, did not improve his vision problems, he "brought this concern to [defendant], and asked her to refer me to the doctor about the problems [he] was having.").

[17] Plaintiff alleges that defendant stopped his eye medication from April 18 until May 2, 2019. Compl. [D.E. 1] at 9. Defendant avers that, aside from Dr. Crocker's July 17, 2019, discontinuation of low-dose aspirin due to plaintiff's alleged hoarding, there is no record that his medications were discontinued. Vittorini Aff. [D.E. 31-1] at ¶48.

[18] Defendant avers that she cared for plaintiff with her best medical judgment and in accordance with the applicable standard of care and was not deliberately indifferent to plaintiff's medical needs. Vittorini Aff. [D.E. 31-1] at ¶48. Plaintiff, by contrast, argues that, after plaintiff had repeatedly complained that the prescribed treatments were not working and caused additional discomfort, defendant's delay in seeking alternative treatment constitutes deliberate indifference to his serious medical need. Pl.'s Mem. [D.E. 36-1] at 4.

7

Arguments:

Plaintiff generally alleges that defendant violated his constitutional rights when she was deliberately indifferent to his serious medical needs as to his left eye. See Compl. [D.E. 1].

Defendant argues she is entitled to summary judgment because: she tended to plaintiff's medical needs and ensured he got treatment; his claims merely disagree with this treatment; and claims that his medications were stopped are unsupported.[19] Def.'s Mem. [D.E. 29] at 12–17.

In his response in opposition to defendant's motion for summary judgment, plaintiff asserts that, between September 13 and October 15, 2018, he "steadfastly complained to [defendant] and Jail staff that the eye drop treatments were not working, [and] that he continued to experience pain, including burning sensation and blurred vision." Plaintiff argues defendant's delay in providing plaintiff different, more efficacious treatment caused a worsening of his vision and constituted deliberate indifference to his serious medical need. See Pl.'s Mem. [D.E. 36-1] at 2–4.

In her reply, defendant argues: because there is no dispute that plaintiff was treated promptly after his initial eye injury, it is not material whether the injury occurred on September 13 or 15, 2018; plaintiff's claims amount to questions of medical judgment, not deliberate indifference; defendant, as a nurse, could not independently adjust medical orders; plaintiff did see specialists for his eye concerns; and, between the date of plaintiff's first specialist appointment on September 18, 2018, and the date defendant attempted to schedule a follow up appointment on October 12, 2018, there is no record of sick-call requests. See Def.'s Reply [D.E. 37] at 2–6.

---

[19] Although defendant also argues she is entitled to qualified immunity, see Def.'s Mem. [D.E. 29] at 17–18, the court finds persuasive the contrary holding in Tanner v. McMurray, 989 F.3d 860, 874 (10th Cir. 2021) ("Neither historical justifications of special government immunity nor modern policy considerations support the extension of a qualified immunity defense to Appellees—private medical professionals employed full-time by a multi-state, for-profit corporation systematically organized to provide medical care in correctional facilities.").

8

Standard of Review:

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 247–48, but "must come forward with specific facts showing that there is a genuine issue for trial," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). In making this determination whether a genuine issue of material fact exists for trial, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Scott v. Harris, 550 U.S. 372, 378 (2007).

Discussion:

Although the Fourteenth Amendment's Due Process Clause generally governs a detainee's claim of deliberate indifference, see Kingsley v. Hendrickson, 576 U.S. 389, 400–01, (2015), the Fourteenth Amendment analysis essentially is indistinguishable from an Eighth Amendment analysis, see Brown v. Harris, 240 F.3d 383, 388–89 (4th Cir. 2001).

The Eighth Amendment "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." Wilson v. Seiter, 501 U.S. 294, 296–97 (1991) (internal citation omitted). To make out a *prima facie* case that prison conditions violate the Eighth Amendment, "a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate

9

indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (quotation omitted). "[T]he first showing requires the court to determine whether the deprivation of the basic human need was objectively sufficiently serious." Id. (emphasis and quotation omitted). The second showing "requires [the court] to determine whether subjectively the officials acted with a sufficiently culpable state of mind." Id. (emphasis, alteration, and quotation omitted). To satisfy the second, subjective showing, a plaintiff must prove the official acted with deliberate indifference. Id.; see Farmer v. Brennan, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.").

Deliberate indifference to a prisoner's serious medical needs violates the prisoner's Eighth Amendment rights. Estelle v. Gamble, 429 U.S. 97, 104 (1976). "In order to establish a claim of deliberate indifference to a medical need, the need must be both apparent and serious, and the denial must be both deliberate and without legitimate penological objective." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999); see Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990) ("To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."), overruled in part on other grounds by Farmer, 511 U.S. at 837; see also Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (noting a plaintiff "must demonstrate that the officers acted with 'deliberate indifference' (subjective) to [his] 'serious medical needs' (objective)." (quotation omitted)).

10

When a prisoner alleges denial or delay of medical care, the prisoner must prove that the prison official knew of and disregarded an objectively serious condition, known medical need, or substantial risk of serious harm. See Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016); Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) (noting subjective prong of a deliberate indifference claim requires proof of "actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by [the official's] action or inaction.")). Beyond such actual knowledge, the official "must also have recognized that his actions were insufficient to mitigate the risk of harm to the inmate." Iko, 535 F.3d at 241 (quotation marks and citation omitted). A prisoner, however, is not entitled to choose his course of medical treatment. See Russell v. Sheffer, 528 F.2d 318, 318–19 (4th Cir. 1975) (per curiam). Disagreements over forms of treatment concern medical judgments, not the Eighth Amendment, see Scinto, 841 F.3d at 225 ("mere '[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances." (citation omitted)), and mere negligence in diagnosis or treatment does not state a constitutional claim, see Estelle, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); Grayson, 195 F.3d at 695 ("Deliberate indifference is a very high standard–a showing of mere negligence will not meet it.").

The court first address plaintiff's claim that his eye was injured on September 13, 2018, not September 15, 2018. See Pl.'s Aff. [D.E. 36-3] at ¶3. As noted above, defendant avers that the record evidence shows plaintiff first received medical treatment for his eye at the Jail on September 15, 2018. Vittorini Aff. [D.E. 31-1] at ¶¶14–15; see [D.E. 32] at 4, 15 (Sept. 15, 2018, medication order and nursing note as to plaintiff's eye). The court, however, credits plaintiff's

11

averment that, on the day of his eye injury, defendant responded to the kitchen to rinse his left eye with a water-based eye solution. See Pl.'s Aff. [D.E. 36-3] at ¶4. Although this intervention apparently did not relieve his ailment, plaintiff does not allege, and the record does not reflect, that defendant "recognized that [her] actions were insufficient to mitigate the risk of harm to the inmate." Iko, 535 F.3d at 241. Thus, this treatment did not violate plaintiff's constitutional rights. See, e.g., Whitley v. Albers, 475 U.S. 312, 319 (1986) ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause[.]"), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam). Accordingly, whether plaintiff's eye injury occurred on September 13 or September 15, 2018, is not a material issue of fact. See Anderson, 477 U.S. at 248–49 (noting that a dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

As to plaintiff's claim that defendant informed plaintiff on September 14, 2018, that he could not receive needed medical treatment due to Hurricane Florence, see Compl. [D.E. 1] at 7, defendant avers that she does not recall making such a statement and that she would not have done so, see Vittorini Aff. [D.E. 31-1] at ¶13. In in his opposition to defendant's motion for summary judgment, plaintiff does not address her contrary averment; rather, he merely rests on the allegations in his complaint, cf. Anderson, 477 U.S. at 248–49, and fails to "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587 (emphasis and quotation omitted). Accordingly, there is no genuine issue of material fact as to this claim.

To the extent plaintiff alleges his medical care was unnecessarily delayed between his eye injury and his appointment at Medical Eye Associates on September 18, 2018, the record supports,

12

and plaintiff does not dispute, defendant's averments that other nurses provided him in-Jail eye treatment on September 15, 16, and 17, and that defendant scheduled his eye appointment on the morning of September 18, 2018. See Vittorini Aff. [D.E. 31-1] at ¶¶14–18; [D.E. 32] at 15–16. Thus, any claims alleging treatment delays in this timeframe do not establish defendant's personal liability. See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) (requiring a § 1983 plaintiff to plead that the defendant, through the individual's own actions, violated the Constitution); Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (requiring a § 1983 plaintiff to "affirmatively show[ ] that the official charged acted personally in the deprivation of the plaintiff's rights," but finding that mere knowledge of such a deprivation does not suffice (internal quotation marks omitted)).

The court now turns to plaintiff's claim that, between the dates of his first Medical Eye Associates appointment on September 18, 2018, and his second Medical Eye Associates appointment on October 16, 2018, plaintiff repeatedly complained to defendant that the prescribed medications were not working and were causing him additional discomfort, but defendant failed to apply a different course of treatment. Compl. Attach. [D.E. 1-2] at 2–3, 15–16; Pl.'s Mem. [D.E. 36-1] at 2–4; Pl.'s Aff. [D.E. 36-3] at ¶¶9–14; Pl.'s Stmt. Mat. Facts [D.E. 36–2] at ¶6.

Although the court presumes that plaintiff's medical issues with his left eye in this timeframe were objectively sufficiently serious, see Strickler, 989 F.2d at 1379, there is no record evidence showing that plaintiff sought emergency treatment, had medical appointments, or submitted any sick-call requests at the Jail between September 18 and October 12, 2018. See [D.E. 32] at 16 (Jail medical progress notes showing no entries for plaintiff between Sept. 18 and Oct. 12, 2018); id. at 4–5 (SHP physician's orders showing no new medication orders for plaintiff between Sept. 18 and Oct. 17, 2018). The record also supports defendant's averments that: she

13

attempted to schedule a Medical Eye Associates follow up appointment on October 12, 2018, because plaintiff "had complaints of not being able to see correctly"; Medical Eye Associates refused make a new appointment until the September appointment bill was paid; defendant notified the SHP corporate office of the billing issue on that date; and, after the billing issue was resolved, she scheduled a Medical Eye Associates appointment on October 15, 2018, for October 16, 2018. Vittorini Aff. [D.E. 31-1] at ¶¶22–24; [D.E. 32] at 16. Plaintiff does not allege, and the record does not reflect, that the billing issue causing this delay was attributable to defendant. See Iqbal, 556 U.S. at 676; Wright, 766 F.2d at 850. Plaintiff also does not dispute defendant's averment that, after the initial Medical Eye Associates appointment, he was prescribed eye medications to self-administer and that it was the Jail medical director, Dr. Crocker, not defendant, who approves orders for all treatment decisions, including prescriptions. Vittorini Aff. [D.E. 31-1] at ¶¶10, 21.

In light of the gap in the medical progress notes between September 18 and October 12, 2018, plaintiff's averment that he repeatedly told defendant his eyedrops were not working and he needed additional medical treatment is belied by the absence of such complaints in the record. See Scott, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Even presuming, without deciding, that, sometime between September 18 and October 12, 2018, defendant became aware of plaintiff's complaints that his prescribed medications caused irritation and did not improve his eye problem, see Pl.'s Mem. [D.E. 36-1] at 4, continuing the ongoing prescribed treatments does not "shock the conscience," cf. Miltier, 896 F.2d at 851, and defendant reasonably relied upon the prior medical decisions by a specialist at Medical Eye

14

Associates and Doctor Crocker, see Farmer, 511 U.S. at 844 (finding a an official "who actually [knows] of a substantial risk to inmate health or safety may be found free from liability if [she] responded reasonably to the risk, even if the harm ultimately was not averted.").

Thus, because no record evidence supports an inference that defendant knew of and disregarded plaintiff's serious medical needs, or acted with the requisite culpable state of mind, plaintiff fails to satisfy the subjective component of a deliberate indifference claim. See Jackson, 775 F.3d at 178; Iko, 535 F.3d at 241. Instead, plaintiff's claims reflect mere disagreement with his course of medical treatment or, at worst, negligent medical care. See Farmer, 511 U.S. at 835; Estelle, 429 U.S. at 105–06; Grayson, 195 F.3d at 695; Russell, 528 F.2d at 318–19. Plaintiff's speculative assertion–that he would have had a better outcome had defendant changed his course of treatment–is supported solely by plaintiff's bald say-so and cannot survive defendant's motion for summary judgement. See Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) (noting "neither '[u]nsupported speculation,' nor evidence that is 'merely colorable' or 'not significantly probative,' will suffice to defeat a motion for summary judgment" (internal citations omitted)); Anderson, 477 U.S. at 252 (noting the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment).

As to plaintiff's claim that defendant stopped plaintiff's eye medication from April 18 until May 2, 2019, see Compl. [D.E. 1] at 9, defendant avers both that she did not do so and that only Dr. Crocker has authority to change medication orders, see Vittorini Aff. [D.E. 31-1] at ¶¶10, 48. Because plaintiff again does not address this contrary averment in in his opposition to defendant's motion for summary judgment, he likewise again fails to show there is a genuine issue for trial as to this claim. See Anderson, 477 U.S. at 248–49; Matsushita, 475 U.S. at 587.

15

In sum, after viewing the evidence and inferences drawn therefrom in the light most favorable to plaintiff, Scott, 550 U.S. at 378, because there is no genuine issue of material fact, defendant is entitled to judgment as a matter of law. See Anderson, 477 U.S. at 248–49; Matsushita, 475 U.S. at 587 (finding summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." (citation omitted)).

Conclusion:

For the reasons discussed above, the court: DENIES plaintiff's "motion for summary judgment" [D.E. 23]; DENIES plaintiff's motions for appointment of counsel [D.E. 24, 35]; GRANTS defendant's motion for summary judgment [D.E. 28]; GRANTS defendant's motion to seal [D.E. 33]; and DIRECTS the clerk to close the case.

SO ORDERED, this 27th day of August 2021.

RICHARD E. MYERS II
Chief United States District Judge